VICTORY, J.
|! Washington St. Tammany Electric Cooperative, Inc. (“WST”) and Cleco Power, LLC. (“Cleco”) are competing to serve customers in the La Chenier Subdivision in Slidell, Louisiana. The issue in this case is whether WST violated the “300 Foot Rule” by extending electrical service to points of connection in the subdivision that were within 300 feet of Cleco’s existing power lines.
FACTS AND PROCEDURAL HISTORY
WST contracted with the developer of the La Chenier Subdivision to provide electrical service to the subdivision, pursuant to which it agreed to construct electric facilities in the subdivision and serve the residents. WST entered into the agreement with the understanding that it might have to concede some of the subdivision lots to Cleco based upon Cleco’s nearby existing facilities. In February 2005, Cle-co filed a complaint with the Louisiana Public Service Commission (the “Commission”) alleging that WST had violated La. R.S. 45:123 and Commission General Order dated May 26, 2004[1], by extending electric service to a sign for La Chenier and ^approximately 60 lots within the sub *453 division, whose points of connection Cleco believed to be within 300 feet of Cleco’s existing electric lines.[2] WST asserted that |swhile it has an agreement to serve all of the subdivision, it currently provides service to only lots 11, 13, 17, 18, 19, 20, 34, 37, 40, the entrance sign, some streetlights in the vicinity of the entrance sign, and a sewer lift station located between lots 11 and 12. WST alleged that it energized the entrance sign prior to Cleco energizing its lines in the area, and that it then extended service back to an area between lots 11 and 12 where the sewer lift station is located. WST based its right to serve the lots in question on its points of connection with the sewer lift station and subdivision sign.
In accordance with the special procedures for adjudication of 300 Foot Rule disputes provided in Rule 67 of the Commission’s Rules of Practice and Procedure, the Commission’s Staff Team issued a written opinion regarding the dispute on March 30, 2005. Asserting that the Staff Opinion was incomplete and inconclusive, on April 13, 20Q5, both Cleco and WST filed complaints, requesting a de novo proceeding. The complaints were consolidated.
A hearing was held before Administrative Law Judge Carolyn DeVitis (the “ALJ”) on June 20, 2005. At the hearing, Cleco asserted that lots 1-3, 21-36, 84-87, 96, 106 and 114, in their entirety, are located within 300 feet of Cleco’s existing power lines, that lots 4-20, 107-111 and 113 are within 300 feet of Cleco’s existing electric line if normal, typical, and legal meter configuration are followed, and that |4the subdivision sign and certain streetlights are located within 300 feet of Cleco’s existing power lines.[3]
At the hearing, Cleco presented the testimony of a licensed land surveyor, Randall Brown, who prepared a plat that illustrated all of the areas within the subdivision that lie within 300 feet of Cleco’s existing lines. Cleco employees Scott Biggers and *454 David Hursey testified that all of the lines on the plat were constructed and in service before construction was begun on the subdivision. According to the plat, lots 1-3, 21-36, 84-87, 96, 106, and 114 are all within 300 feet of Cleco’s pre-existing lines.
The plat also showed that lots 4-20,107-111, and 113 were placed so that almost all of each of them fell within 300 feet of Cleco’s lines, with only the rear 14 feet being outside of the 300 foot range. Cleco introduced Restrictive Covenant No. 10 which provided for a minimum set back of 25 feet from the rear of the property and introduced testimony and photographs showing that the normal placement of residential meters was attachment to the exterior wall of the residence. Because a structure cannot be placed within the final 14 feet of a lot in the subdivision, it would not be possible to place a point of connection outside of 300 feet of Cleco’s existing power lines.
WST did not dispute the claims with regard to Cleco’s lines as shown by the plat; instead, WST claimed that it also obtained rights under the 300 Foot Rule to serve the lots in question as a result of its service to a sewer lift station and sign within the subdivision. WST asserted before the ALJ that it was entitled to provide electricity to the La Chenier subdivision sign because Cleco had no energized electric lines within 300 feet of the sign. From that sign, WST alleged that it extended its | (¡facilities along the rear of the lots fronting a proposed extension of Cross Creek Drive in order to serve a sewer lift station located on the common area between lots 11 and 12.[4] The evidence presented showed that the lift station was within 300 feet of an existing Cleco line, but that the meter was placed in a position that was outside this 300 foot range. From the lift station meter, WST claimed 300 Foot Rule rights to other lots in the subdivision.
The ALJ credited the evidence presented by Cleco that its line was energized first, and therefore Cleco had the right to service the subdivision sign. The ALJ also found that WST violated LPSC General Order dated May 10, 2005, by placing the meter station to the lift station outside of Cleco’s 300 foot rights. The ALJ found that no explanation was offered for the unique placement of the meter station other than to be outside of 300 feet of Cleco’s line, and that therefore, WST was not entitled to serve the lift station and that no 300 foot rights flowed in favor of WST from serving the lift station. Accordingly, the ALJ entered the following order:
That Cleco’s claims as regards lots 78, 79, 83, 88, 94, 112, 115 are hereby dismissed with prejudice.
That as between Cleco and WST, Cleco is entitled to serve Lots 1-3, 21-36, 84-87, 96,106, and 114.
That as between Cleco and WST, Cleco is entitled to serve Lots 4-20, 107-111, and 113.
That WST’s service to the Lift Station is in violation of La. R.S. 45:123 and Commission Orders.
| fiThat WST is directed to promptly discontinue service to the Lift Station and *455 arrange to transfer service to Cleco as soon as Cleco is able to provide service to the Lift Station.
That, as it has been determined that WST cannot legitimately serve the lift station, no 300 foot rights flow from the line serving the lift station.
That, while the issue remains close, the preponderance of the evidence indicates that Cleco, rather than WST should serve the La Chenier Subdivision sign. That WST is directed to promptly discontinue service to the La Chenier Subdivision sign and arrange to transfer service to Cleco.
That under the particular facts [and] circumstances of the case, a fine will not be imposed.
The ALJ’s decision was affirmed by a unanimous vote of the Commission in its October 19, 2005, Business & Executive Session and resulted in Order U-28704 consolidated with Order U-28705. WST appealed the Commission’s Order to the 19th Judicial District Court. After a hearing, the court entered a Judgment affirming the Commission’s Order. WST appealed to this Court pursuant to La. Const, art. IV, § 21(E), which provides that this Court has jurisdiction over a direct appeal from any judgment rendered by the district court in connection with the judicial review of any action taken by the Commission.
DISCUSSION
The Louisiana Constitution provides the Commission with the authority to “regulate all common carriers and public utilities” and to “adopt and enforce reasonable rules, regulations, and procedures necessary for the discharge of its duties ...” La. Const, art. IV, § 21. As a general rule, an order of the Commission should not be overturned on review unless it is shown to be arbitrary, capricious, abusive of its authority, or not reasonably based upon the evidence presented. Alma Plantation v. Louisiana Public Service Com’n, 96-1423 (La.1/14/97), 685 So.2d 107, 110-111; Washington-St. Tammany Elec. Coop., Inc. v. Louisiana Public Service Com’n, 95-1932 (La.4/8/96), 671 So.2d 908, 912. The Commission’s factual conclusions are entitled to great deference, as are its interpretation of its own rules and orders. Alma Plantation, supra at 110. However, the Commission is not entitled to deference in its interpretation of statutes and judicial decisions. Washington-St. Tammany Elec. Co-op., Inc., supra at 912. A person attacking a Commission order bears a high burden of demonstrating that it is defective. Louisiana Power & Light Co. v. Louisiana Public Service Com’n, 609 So.2d 797, 799-800 (La.1992).
Generally, La. R.S. 45:123 prohibits one electric public utility from serving a point of connection which is: (1) currently being served by another electric utility or (2) .not currently being served by another electric utility but is located within 300 feet of an electric line of another electric utility, without written consent of that utility. However, this prohibition does not preclude a utility from extending service to an applicant for .service “at an unserved point of connection” within 300 feet of its own line. La. R.S. 45:123(A)(l)(a). As a result, if there is an unserved point of connection within 300 feet of two public utilities’ electric lines, the customer is allowed to choose the provider, which is known as “customer choice.” Washington-St. Tammany Elec. Co-op, Inc., supra at 913. For purposes of La. R.S. 45:123, an electric line is a line which was not originally constructed for the principal purpose of preempting territory.
In addition, the May 26, 2004 General Order provides:
*456 It is the determination of this Commission that, in order to effect economies in the service of electricity, and thereby maintain reasonable rates, uneconomic and wasteful practices should be prohibited. As a result, the needless paralleling and duplication of existing transmission or distribution lines or the extensions thereof, by electric public utilities in order to serve customers readily accessible to like facilities of an electric public utility already providing service in the immediate area, should be discouraged.
1 ¡¿Further, the General Order also states that “[a] competing utility shall not serve the point of connection presently or previously served by another electric public utility by placing a meter or by placing a Point of Connection outside 300 feet of the service location.” Finally, the General Order provides that “[wjhere necessary, the Commission shall determine whether the choice of the meter location was intended to circumvent this General Order prohibiting the needless duplication or extension of facilities.”
The two issues to be resolved in this case are (1) whether Cleco had an energized electric line within 300 feet of the La Chenier subdivision sign at the time WST connected to that sign, and (2) whether the meter at the sewer lift station was placed outside 300 feet of Cleco’s existing line in order to circumvent the 300 Foot Rule. The Commission’s findings regarding these issues will not be disturbed unless we find them to be clearly erroneous or unsupported by the evidence.
Cleco alleged that it had an energized underground electric line approximately 100 feet from the point of connection of the sign at the time WST connected to the sign, and the Commission agreed. WST claims that the Commission’s factual findings were arbitrary and capricious and unsupported by the record because the ALJ failed to consider uncontradicted testimony of WST’s employee, Jesse Perry, that WST’s line was installed to the subdivision sign before the CLECO line was installed or energized. Mr. Perry testified that the WST line to the La Chenier sign was energized “[mjaybe November — right after Thanksgiving 2003, and the permit came in maybe the end- — December 10, 2003, by memory.” He testified that a sign was being constructed for the Turtle Creek subdivision, right across the street from the La Chenier sign, which was to be energized by a Cleco line, but that sign was not energized until December, 2003. He also testified that streetlights in the area, that | ¡¡were supposed to be energized by Cleco, were not working as of December 10, supporting his belief that the Cleco line was not energized as of that date. He testified that both WST and Cleco were working on energizing these signs at the same time, and that one of WST’s lines was cut, probably when Cleco was putting in its line, again confirming his belief that the WST line was energized first. On cross-examination, he testified that before WST began digging the underground line to service the sign, he called Louisiana One Call to make sure WST “didn’t hit anything,” and that Louisiana One Call did not find anything. However, he testified that this dig was not to determine 300 foot rights and was not in the location of Cle-co’s lines to the Turtle Creek subdivision.
WST’s employee Charles Hill testified that he did not believe Cleco’s electric line was installed and energized at the time WST connected to the subdivision line. However, he conceded that he never visited the site to consider 300 Foot Rule violations, and thus was never really looking for such violations.
Two Cleco employees testified regarding the subdivision sign. Biggers identified *457 Cleco’s electric lines and points of connection located on the Brown plat. Biggers testified that the first violation Cleco noticed was WST’s meter located behind the subdivision sign and 110 feet from Cleco’s existing electric line. .Although Biggers did not recall the exact date the Cleco line was constructed, he testified “our lines were there when WST hooked to that meter ... ” and “I do know our lines were there when they hooked up to [that meter], and that’s what initiated this [complaint] ...” and “I just know they’ve been there for several years.”
Hursey testified that he did not recall when WST first connected to the sign, but testified that “I do recall it was late in the year; I do recall it was after our system was installed and energized.” He knew this because “when we sent Randy Brown — |whenin I sent him out- here to do this, there was nothing here. So, in order for him to take these measurements from all of this equipment, it would have had to have been installed prior to that.” He recalled that the Cleco line within 300 feet of WST’s connection to the subdivision sign was installed “around September, possibly even August — August or September — and energized by late September of that year, early October, possibly.” Hur-sey further testified that Cleco’s line was installed before WST’s connection of the street sign. On cross-examination, he admitted he had no documentation to prove that the Cleco line was installed and energized before WST connected to the subdivision sign. WST’s attorney showed him a letter indicating that WST extended electrical service to the La Chenier sign on December 8 and that Cleco’s permit for the Turtle Creek sign across the street was not until December 29. However, when Hursey was recalled to the stand, he identified three Cleco construction reports. The first and second, dated October 31, 2003, and November 7, 2003, stated that for Turtle Creek Phase 5-1-C, “we experienced a dig which destroyed about 3,000 feet of cable. We are replacing it and should finish this week.” He explained that a contractor doing site work for La Chenier was installing culverts underneath the road and dug into Cleco’s cable, damaging a significant amount of it. A report dated November 19, 2003 stated “the system should be energized again this week.” These reports indicated that the Cleco line was energized before the subdivision sign was connected by WST, but it may have been briefly de-energized while the line was being repaired.
After hearing this conflicting testimony, the ALJ found:
Cleco was more effective in providing rebuttal testimony for WST’s testimony and explanations of why that testimony was not conclusive. Useful plats were provided, but otherwise documentation of events was sparse. A reference was made to permits by a WST employee, but no documents were provided. Cleco did provide corroborating evidence for its claim of an earlier installation and energization in the form of three In Construction Progress Reports. While the issue remains close, the preponderance of the evidence indicates that Cleco, rather than WST should serve the La Chenier Subdivision sign.
After reviewing the record, we find that the ALJ’s finding on this issue, and the Commission’s subsequent order, were not arbitrary, capricious, or not reasonably based upon the evidence presented. It is not our function to reweigh or reevaluate the evidence and we will not. A finding that Cleco had an energized line within 300 feet of the subdivision sign at the time WST connected to the sign is reasonable based on the evidence presented.
*458 The next issue involves the meter placement at the lift station.[5] The evidence was clear that had the meter been placed on the lift station, its location would have been within 300 feet of Cleco’s lines. However, the meter was placed some distance from the lift station, and the placement was outside of 300 feet of Cleco’s lines.
Riggers testified that the meter location for the lift station was “the first one I’ve seen like that, in that particular setup.” Hursey testified that he had never seen a meter located away from a lift station like that and was not aware of any reason why that would be done. When Mr. Gallegos was asked whether he had ever seen any lift stations with the meter located such a distance from it, he answered:
Normally not. I don’t recall seeing one, but I can see where it could happen, in that the responsibility for all the conductor from that meter to a lift station is the customers. And it may be some benefit to the utility to have the meter that far away so they’re not responsible for anything that happens underground there from there to the sewer lines.
li?.The ALJ concluded that “[g]iven the circumstances, it would be very difficult not to conclude that the choice of the meter location was an attempt to avoid the Commission’s 300 Foot Rule.” Accordingly, the ALJ found:
WST should not be permitted to avoid operation of the 300 Foot Rule by placing a remote meter outside of 300 feet to serve a lift station that lies within 300 feet of Cleco’s lines. Placing a meter away from the lift station in order to avoid Cleco’s rights provided under Commission Order, should not be tolerated.
WST argues that the ALJ rejected the testimony of Mr. Perry, who testified that when WST was ready to begin installing electric lines to serve the lift station, he went to the site and found that the meter rack, meter pan and underground conduit had already been set by the electrician employed by the developer. He testified that WST did not chose the location of the meter, and that WST had no conversations with either the developer or the electrician about the meter location, thus negating any inference that WST conspired with the customer to circumvent the 300 Foot Rule. Further, WST argues that because the customer chose the meter location, the Commission has exceeded its authority in that it has no right to regulate the conduct of private individuals. We disagree.
In Washington-St. Tammany Elec. Coop, Inc., supra, we reiterated that “the purpose of R.S. 45:123 is to ‘avoid the needless duplication of electric facilities.’ ” 671 So.2d at 914 (citing Louisiana Power & Light v. Louisiana Public Service Com’n, supra at 801; Claiborne Elec. Coop., Inc. v. Louisiana Public Service Com’n, 388 So.2d 792, 796 (La.1980); Central Louisiana Elec. Co., Inc. v. Louisiana Public Service Com’n, 344 So.2d 1046, 1048 (La.1977); Louisiana Power & Light Co. v. Louisiana Public Service Com’n, 343 So.2d 1040, 1043 (La.1977)). In that case, we discussed scenarios under which interpreting “point of connection” to mean the actual meter box could lead to violations of the needless | ^duplication of services which the 300 Foot Rule is meant to avoid. *459 Specifically, we held that “a customer being served by one utility located within 800 feet of the lines of two electric utilities, but presently being served by one utility, could create a customer choice situation simply by destroying his existing meter box or moving it to another location on the same structure.” Id.
While the Commission does not have the authority to tell private individuals where they can install their meters, the Commission has the explicit authority to prohibit the needless duplication or extension of facilities, and it currently does that by enforcement of the 300 Foot Rule. Pursuant to General Order dated May 26, 2004, the Commission may determine whether a meter location has been selected to circumvent the 300 Foot Rule, regardless of whether that selection was made by the utility or the customer. Further, the Commission can, without question, prevent an electric utility from providing service to a point of connection that circumvents the 300 Foot Rule.. Thus, we hold that the Commission did not exceed its jurisdiction by prohibiting WST from providing service to the lift station meter, even though WST did not chose the meter location. The Commission found that the meter location was chosen in an attempt to circumvent the 300 Foot Rule, and there is a reasonable evidentiary basis in the record to support this finding. Therefore, we affirm the Commission’s Order that WST has no right to serve the sewer lift station and that no 300 Foot rights flow from WST’s service to the lift station.
DECREE
For the reasons stated herein, the judgment of the district court is affirmed.
AFFIRMED.

. Collectively, La. R.S. 45:123 and the corresponding Commission General Order dated May 26, 2004, comprise what is commonly referred to as the "300 Foot Rule." La. R.S. 45:123 provides:
§ 123. Stabilizing service by electric public utilities; extension and construction of facilities, regulation thereof; limitations on municipally-owned or operated utilities
A.(1) No electric public utility shall construct or extend its facilities or furnish or offer to furnish electric service to any point of connection which at the time of the proposed construction, extension, or service is being served by, or which is not being served but is located within three hundred feet of an electric line of another electric public utility, except with the consent in writing of such other electric public utility. However, nothing contained herein shall preclude:
(a) Any electric public utility from extending service to an applicant for service at an unserved point of connection located within three hundred feet of an existing electric line of such electric public utility, unless:
(i) Such line was not in operation on April 1, 1970, and
(ii) The point of connection is located within three hundred feet of an existing electric line of another electric public utility, which line was in operation on said date, or
(b) Any electric public utility from extending service to its own property or to another electric public utility for resale.
(2) Further, any consumer receiving electric service from a public utility that is subject to the jurisdiction of the Louisiana Public Service Commission who feels aggrieved with the electric service being received by him may apply to the Louisiana Public Service Commission for an order directed to his present supplier to show cause why the consumer should not be released from said supplier, and if the commission shall find that the service rendered to such consumer is inadequate and will not be rendered adequate within a reasonable time the release shall be granted.
B. As used in this Section, "electric line” means a line constructed and operated for the transmission or distribution or transmission and distribution of electricity, and that was not originally constructed for the principal purpose of preempting territory.
C. Nothing in this Section shall either prohibit or mandate the performance by any parish, municipality, political subdivision, or combination thereof, of any agreement for the sale of electric power executed prior to January 1, 1984, or any renewal of such agreement. Nothing in this Section shall prohibit or mandate in the performance of such agreement the furnishing of service to persons and business organizations being served by another electric public utility.
*453 D. Notwithstanding any other provision of this Section, any municipally-owned or operated utility may furnish or offer to furnish electric service to any point of connection for a retail consumer who is not being served by another utility without the necessity of obtaining the written consent of any other utility if such point of connection is within one mile of such municipality's corporate limits, as such corporate limits of a municipality with more than fifty megawatts of peak load exist on the effective date of this Section and on every third anniversary date of the effective date of this Section, and as such corporate limits of all other municipalities which have fifty megawatts or less of peak load now or in the future exist from time to time.
E. Nothing in R.S. 45:121, 45:123, 45:1161, 45:1175, or R.S. 12:426 shall alter the rights or authority of municipalities with respect to franchises within the corporate limits of a municipality as such limits exist from time to time.

. Specifically, Cleco alleged in its Petition as follows:
Upon information and belief, the evidence will show that the points of connection of these lots, and possibly others, are located within 300 feet of Cleco’s existing line, and not within 300 feet of any electric line belonging to WST. Alternatively, the evidence will show that the locations of the points of connection for the lots in question were chosen with the intent to circumvent the 300 Foot Rule Order. Additionally, Cleco asserts that the points of connection for subdivision signs and streetlights within the subdivision are located within 300 feet of Cleco’s existing lines, and not within 300 feet of any existing line belonging to WST.
On June 20, 2005, Cleco amended its complaint to dismiss without prejudice any 300 foot right claims to Lots 78, 79, 83, 88, 94, 112, 115 and 116.

. Cleco conceded that lots 77, 95, and 117 are located outside of Cleco's existing electric line if normal, typical, and legal meter configuration are followed.

. WST contends that prior to its extension of service to the point of connection for the lift station, Cleco had the right to serve Lots 4-14 and Lots 21-32, and potentially, Lots 3, 15, and 33, depending upon the location of the point of connection. However, upon completion of its extension to the lift station point of connection, WST then also had existing facilities within 300 feet of Lots 4-14 and lots 21-32, and, as a result, that area became customer choice. In addition, by extending service to the lift station, WST contends it gained the exclusive right to serve Lots 41-43, 50-52, 59-61, 97 and 101-105, as well as potentially Lots 98-100 and 109, depending upon the location of the point of connection.

. We reject WST’s argument that WST's service to the lift station was not part of Cleco's complaint and it was therefore error for the ALJ to consider it. The lift station was at all times considered a part of the territory claimed by Cleco, as clearly marked on its map of the La Chenier subdivision. Service to the entire subdivision was at issue in this case and the lift station is located in the subdivision. Further, WST is now asserting the right to serve certain of these lots based on its point of connection to the lift station.